IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| VIVIAN FULWOOD, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| WALMART INC. and WAL-MART STORES EAST, LP, | 5:21-cv-00458 |
| Defendants. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Vivian Fulwood, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. and Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq*. Plaintiff alleges that Defendants subjected Plaintiff to discrimination based on her sex and disability, including by subjecting Plaintiff to harassment and a hostile work environment and failing to accommodate Plaintiff's disability, resulting in the termination of Plaintiff's employment with Defendants, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1343 and the enforcement provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, and the Americans with Disabilities Act, 42 U.S.C. § 12117.

2.

Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2) because Plaintiff was employed and the events underlying this action occurred in Monroe County, Georgia, which is located in this judicial district.

## PARTIES

3.

Plaintiff Vivian Fulwood (hereinafter, "Plaintiff" or "Fulwood") is a citizen of the United States and a resident of Georgia.  At all times relevant to this suit, Ms. Fulwood was employed with Defendants Walmart Inc. and Wal-Mart Stores East, LP at a store located at 120 North Lee Street, Forsyth, Monroe County, Georgia 31029.

4.

At all relevant times, Ms. Fulwood was considered a covered employee under Title VII of the Civil Rights Act and the Americans with Disabilities Act.

5.

Defendant Walmart Inc. is a foreign profit corporation, incorporated under the laws of the State of Delaware.  Said Defendant's principal office is located at 708 SW 8th Street, Bentonville, Arkansas 72716.  Said Defendant may be served with process through its registered agent, The Corporation Company (FL), located at 106 Colony Park Drive, Suite 800-B, Cumming, Forsyth County, Georgia 30040.

6.

Defendant Walmart Inc. is an American multinational retail corporation that operates a chain of hypermarkets, or supercenters.  Said Defendant is engaged in interstate commerce, has

annual revenue in excess of $500,000.00, and has employed in excess of 500 employees, working for at least 20 calendar weeks in 2020 and in prior calendar years.

7.

Defendant Walmart Inc. is a covered employer with the meaning of Title VII of the Civil Rights Act and the Americans with Disabilities Act.

8.

Defendant Wal-Mart Stores East, LP is a foreign limited partnership, formed under the laws of the State of Delaware.  Said Defendant's principal office is located at 708 SW 8th Street, Bentonville, Arkansas 72716.  Said Defendant may be served with process through its registered agent, The Corporation Company (FL), located at 106 Colony Park Drive, Suite 800-B, Cumming, Forsyth County, Georgia 30040.

9.

Defendant Wal-Mart Stores East, LP is one of numerous subsidiaries of Defendant Walmart Inc., operating retail locations in the Southeastern United States.  Said Defendant is engaged in interstate commerce, has annual revenue in excess of $500,000.00, and has employed in excess of 500 employees, working for at least 20 calendar weeks in 2020 and in prior calendar years.

10.

Defendant Wal-Mart Stores East, LP is a covered employer with the meaning of Title VII of the Civil Rights Act and the Americans with Disabilities Act.

11.

Defendants Walmart Inc. and Wal-Mart Stores East, LP (hereinafter, collectively, "Defendant") jointly control the means and manner of their employees' work performance.

12.

Defendants, collectively, jointly control the terms, conditions, and privileges of their employees' employment.

13.

Defendants, collectively, jointly control their employees' compensation.

14.

Defendants, collectively, provide their employees with the same training.

15.

Defendants, collectively, have adopted the same policies and procedures for their employees.

16.

Defendants, collectively, share the same principal office address.

17.

Defendants, collectively, share ownership and management.

18.

Defendants, collectively, share the same branding and marketing and hold themselves out to the public as the same business entity.

19.

Defendants are a single employer, integrated enterprise, and/or joint employer as it relates to Title VII of the Civil Rights Act and the Americans with Disabilities Act.

## STATEMENT OF FACTS

### 20.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 19, as if the same were set forth herein.

### 21.

Ms. Fulwood identifies as transgender and female.

### 22.

As a person who identifies as transgender, the sex that Ms. Fulwood was assigned at birth, as determined by the appearance of external sex characteristics, does not match her innate, internal sense of her gender identity.  In other words, identifying as transgender means that a person's external characteristics and their perception of their own sex do not match.

### 23.

However, identifying as transgender has no impact on a person's contribution to society or ability to perform their job. People who identify as transgender have no impairment in judgment, stability, reliability, or general social and vocational capabilities solely because of their transgender status.

### 24.

Transgender people face stigma and discrimination across nearly all areas of life, including in employment, housing, healthcare, and public accommodations.  The 2015 U.S. Transgender Survey Georgia State Report[1] illuminates the issues facing transgender Georgians.  One out of five report losing a job due to their gender identity or expression.  Of those employed, one-third reported being fired, not hired, or denied a promotion for being transgender, and large percentages

---

[1] National Center for Transgender Equality, *2015 U.S. Transgender Survey: Georgia State Report* (2017), https://transequality.org/sites/default/files/docs/usts/GA-State-Report-FINAL.pdf.

reported other forms of mistreatment, including being denied appropriate restroom facilities, told that they had to hide their transgender status work, or that they had been subjected to verbal or physical harassment or even sexual assault.  This widespread discrimination leads transgender Georgians to have unemployment and poverty rates of over twice the national average.

25.

Nearly one in three transgender Georgians have experienced homelessness at some point in their lives and more than one in four have been denied housing because they identify as transgender.  Over half avoided using public restrooms out of fear.  One-third report negative experiences with healthcare providers, including being refused treatment, and a quarter did not seek medical care when it was needed due to an apprehension of being subjected to mistreatment.

26.

Additionally, due to a number of bureaucratic hurdles and requirements, most transgender Georgians are prevented from obtaining state-issued documents and identification that correctly reflect their name and gender.  This creates a public safety hazard as one in three transgender Georgians report that they have experienced verbal harassment, denial of service, or assault when they have shown their identification to others.

27.

Like some other people who identify as transgender, Ms. Fulwood suffers from gender dysphoria, which is a clinical diagnosis of the diagnosable clinical distress that she experiences as a consequence of the incongruence of her assigned sex and the gender by which she identifies.

28.

Gender dysphoria impairs Ms. Fulwood's major life activities such as her ability to concentrate, think, communicate, work, and to care for herself, among others.  Additionally,

gender dysphoria has caused Ms. Fulwood to feel symptoms of depression and she has struggled to feel comfortable going to social outings and activities.

29.

Treatment for gender dysphoria is intended to assist a person undergoing a gender transition to alleviate the distress caused by gender dysphoria and to allow the person to live in alignment with the gender that the person identifies.

30.

Ms. Fulwood has been under the care of medical professionals for her condition and her treatment has included a period of social transition, during which time it was recommended that Ms. Fulwood wear clothing, use names and pronouns, and interact with peers all in a manner that is consistent with the gender that she identifies.  Ms. Fulwood's treatment has also included medication intended to change the hormone balance in the body to be consistent with her affirmed sex.

31.

Notwithstanding her gender dysphoria, Ms. Fulwood was able to perform the essential functions of her position with or without a reasonable accommodation.

32.

Ms. Fulwood began her employment with Defendant in October 2018.

33.

Based in part on the information that Ms. Fulwood provided in her onboarding paperwork, as well as the information returned in her background check, Defendant knew that Ms. Fulwood identified as a transgender female from the start of her employment.

34.

Additionally, Ms. Fulwood disclosed the fact that she identifies as transgender to the three individuals who were involved in her interview and/or on-boarding meeting.

35.

Around the time that she began her employment, Ms. Fulwood tried to make it so that Defendant's records reflected her preferred name instead of that assigned at birth. Ms. Fulwood was told that she could use her preferred name on her nametag or badge, but Defendant refused to allow Ms. Fulwood to use anything other than her legal, birth name in all of Defendant's personnel records.

36.

According to its statements submitted to the Equal Employment Opportunity Commission, "[p]er [Defendant's] policy, an Associate's legal name is used on employment records unless the Associate legally changes his or her name and initiates the process through Human Resources."

37.

As a result of the aforementioned policy, Defendant always referred to Ms. Fulwood by the name given to her at birth, which is sometimes referred to as a "dead name."

38.

Because of concerns that Ms. Fulwood had for her safety, she would have preferred that her new colleagues not know that she identified as transgender.

39.

Moreover, part of Ms. Fulwood's treatment plan for gender dysphoria is to use the names and pronouns consistent with how she identifies. It is similarly critical to Ms. Fulwood's treatment

that the people interacting with Ms. Fulwood respect and use only the name and pronouns that are consistent with her gender identity.

40.

Academic and medical research shows that, for individuals who identify as transgender, being referred to by inappropriate pronouns, honorifics, or names can be exhausting and demoralizing, it can cause the person to feel invalidated and unseen, and particularly when this occurs on a daily basis, it can become a burden that can negatively impact the person's mental heath and ability to function in the world.[2]

41.

Upon information and belief, out of all of the employees at the store where Ms. Fulwood was employed, she remained the only person who identified as transgender throughout the duration of her employment.

42.

Unfortunately, throughout the duration of her employment, Ms. Fulwood was subjected to harassment and inappropriate conduct and comments related to her gender identity and disability on a near-daily basis.

43.

From the time that she began working, many of Ms. Fulwood's coworkers would frequently refer to her using her dead name.

---

[2] *See, e.g.*, Sabra L. Katz-Wise, PhD, *Misgendering: What it is and why it matters*, Harvard Health Publishing, Harvard Medical School, July 23, 2021, https://www.health.harvard.edu/blog/misgendering-what-it-is-and-why-it-matters-202107232553 (citing K. A. McLemore, *A minority stress perspective on transgender individuals' experiences with misgendering*, Stigma and Health, 3(1), 53-64 (2008), https://psycnet.apa.org/doi/10.1037/sah0000070).

44.

Ms. Fulwood had not known her coworkers prior to her employment, and, as result, Ms. Fulwood had not done anything that would have caused the coworkers to know her birth name.

45.

On one occasion, one of Ms. Fulwood's coworkers named Patricia apparently saw Ms. Fulwood's birth name listed on an employee schedule that a supervisor had posted in a common area.  Later, when Patricia saw Ms. Fulwood on the sales floor, and within earshot of other employees and customers, Patricia referred to Ms. Fulwood by her deadname.  Patricia said that she thought it was "funny."

46.

It was solely because of Defendant refusal to use the name that Ms. Fulwood preferred that her coworkers know of and referred to her by her birth name.

47.

Similarly, Ms. Fulwood would either overhear and had several of her coworkers tell her that other employees would discuss Ms. Fulwood outside of her presence, question her use of the women's restroom and her gender identity.  People would also say that they did not "agree" with Ms. Fulwood identifying as transgender.

48.

Throughout her employment, Ms. Fulwood found herself attempting to correct the people who misgendered her.  However, many of these individuals would immediately revert to using the incorrect pronouns, which suggests that such conduct was intentional.

49.

Ms. Fulwood was frequently misgendered, not only by her coworkers, but by some supervisors and members of management.

50.

Even after Ms. Fulwood corrected people who misgendered her, including supervisors and members of management, most continued to refer to her as male.

51.

In or around January 2019, Ms. Fulwood began receiving hormone therapy to treat her gender dysphoria. Ms. Fulwood soon realized that this new medication was increasing the frequency in which she had to use the restroom.

52.

Previously, Ms. Fulwood had encountered problems with one of Defendant's day shift supervisors named Tyrone (hereinafter, "Day Shift Supervisor") intentionally misgendering her on a routine basis. However, when Ms. Fulwood began having to use the restroom more frequently, the Day Shift Supervisor approached Ms. Fulwood and specifically criticized her for using the restroom so often.

53.

Ms. Fulwood tried to explain to the Day Shift Supervisor that her frequent restroom usage was the result of her new medication.

54.

In response, the Day Shift Supervisor berated Ms. Fulwood, and then told Ms. Fulwood that she would have to start using the restroom on her own time (i.e., when she was not on the clock).

55.

The Day Shift Supervisor's directive was inconsistent with Defendant's policies, as Defendant does not require its employees to clock out when taking a restroom break.

56.

As a result of the incident with the Day Shift Supervisor, Ms. Fulwood contacted Defendant's Ethics Hotline to submit a complaint.

57.

Shortly after she submitted this complaint, Ms. Fulwood received a call from a representative in Defendant's "Home Office." While acknowledging receipt of this complaint, the representative's tone was very accusatory toward Ms. Fulwood, and Ms. Fulwood was explicitly told that it was her fault that the supervisor had asked her such inappropriate questions.

58.

Outside of the aforementioned call, Ms. Fulwood did not receive any other information concerning an investigation in her complaint, and she does not know whether Defendant disciplined the Day Shift Supervisor for his conduct or even counseled him about this incident.

59.

However, in or around the next month, the Day Shift Supervisor overheard a conversation between Ms. Fulwood and one of her female coworkers in which the coworker mentioned her boyfriend. The Day Shift Supervisor interrupted the conversation, placed his arms around the coworker, kissed her, and stated, "oh, I thought that I was your boyfriend." Defendant terminated the Day Shift Supervisor as a result of this incident and at some point soon after.

60.

In or around March 2019, Ms. Fulwood submitted a second complaint to the Ethics Hotline.

61.

In her written complaint, Ms. Fulwood alleged that the same Day Shift Supervisor had continued referred to Ms. Fulwood as "man," and he would only use the pronouns "he" and "him" when referring to Ms. Fulwood, even though he was completely aware that Ms. Fulwood identifies as female and she had tried to politely correct him.  In her complaint, Ms. Fulwood also mentioned how the Day Shift Supervisor was continuously asking about Ms. Fulwood's restroom usage and asking why she was going so much and what she was actually doing.

62.

Ms. Fulwood's complaint also addresses an incident in which one of her male coworkers named Matt approached Ms. Fulwood and said, "how's the becoming-a-woman-thing going?"  Ms. Fulwood tried to avoid further interaction by simply replying, "fine."   When another employee entered into this conversation and referred to Ms. Fulwood with a male pronoun, Matt responded to the employee by stating sarcastically, "No!  *He's* trying to become a girl!"  The two employees immediately laughed about the incident.

63.

In her complaint, Ms. Fulwood also alleged that, even though Assistant Store Manager Beau Rhine knew Ms. Fulwood's preferred pronouns, he would still misgender he on occasion. When Defendant asked for Mr. Rhine to write a statement about the allegation, he explained that he had never been told about Ms. Fulwood's preference, and that any time that he may have misgendered Ms. Fulwood was unintentional and not intended to upset her.  Mr. Rhine would later apologize directly to Ms. Fulwood, which she accepted, and the working relationship between the two began to improve soon thereafter.

64.

Ms. Fulwood's complaint also addressed how Assistant Store Manager Elisha Perry (hereinafter, "ASM Perry") constantly misgendered her.  Based on the allegations herein, it would appear that ASM Perry's conduct was intentional.

65.

Finally, Ms. Fulwood explained that Patricia, Defendant's Personnel Manager, who was the first person whom Ms. Fulwood had told that she identified as transgender since Patricia had been responsible for running Ms. Fulwood's background check during onboarding, frequently misgendered her in front of other employees.

66.

Defendant failed to discipline any of the individuals that Ms. Fulwood mentioned in her complaint.

67.

Additionally, Defendant refused to provide Ms. Fulwood with any information concerning the results of the investigation.

68.

After Ms. Fulwood submitted her March 2019 complaint, other employees, including supervisors, continued to reference Ms. Fulwood's dead name, make reference to her using male pronouns, and make Ms. Fulwood feel generally disrespected.

69.

While Ms. Fulwood did not have much contact with Store Manager Dennis (hereinafter, "Store Manager Dennis"), there was enough interaction for Ms. Fulwood realize that he interacted

with her differently than her coworkers.  There were numerous occasions where Store Manager Dennis would simply ignore Ms. Fulwood and refuse to speak with her.

70.

Defendant had what it called a "no fault" attendance policy, in which employees are given "points" for absences, regardless of whether an absence was for a legitimate illness, a disability, or for some other legitimate reason.  After an employee receives the requisite number of points, they were subject to immediate termination.

71.

During her tenure, Ms. Fulwood observed or heard about numerous occasions in which supervisors removed points from employees' records, thereby preventing the employee from receiving disciplinary action or termination for unapproved absences.  Additionally, Ms. Fulwood was aware of coworkers who had indeed accrued enough points to get fired, but Defendant failed to take any disciplinary action.

72.

Still, when one of Defendant's employees at this location is terminated, it is customary for Defendant to allow the employee to appeal the termination or apply for reemployment after a period of 30 days.

73.

On or about February 20, 2020, the Equal Employment Opportunity Commission issued a determination in another case in which it found Defendant's attendance policy violated a disabled employee's rights under the Americans with Disabilities Act. *See James v. Wal-Mart Stores, Inc.*, *et al.*, EEOC Charge Number 570-2017-01803.

74.

Throughout the year 2019, Ms. Fulwood observed a number of her coworkers, who were less qualified and had less tenure than her, receive pay raises, get converted to full-time status, or receive promotions.

75.

Ms. Fulwood was one of the last members of her team to obtain full-time status, which was only done in December 2019, about a month prior to her termination and after she had been requesting the change for months.  Despite her requests, her supervisors failed to follow up as they said they would.

76.

Even after Ms. Fulwood was made a full-time employee, she was not provided with the same benefits as other employees, such as the accrual of paid leave.

77.

There were a number of occasions in which Ms. Fulwood was at work for the day, but Defendant still marked her as being absent.  One of the occasions was January 2, 2020, in which Ms. Fulwood was one of the few people who had actually reported for the day; yet, Defendant marked her as absent.

78.

On January 11, 2020, Ms. Fulwood felt like she was becoming ill as she traveled to work for the day.  When she arrived at the store well before her scheduled shift, she immediately requested PTO in Defendant's personnel portal.

79.

According to Defendant's policies, Ms. Fulwood should have been granted "Protected PTO," or an absence due to illness or an unexpected emergency, which is not supposed to result in receipt of a point or any other adverse consequences.

80.

This portal had been the only method by which Ms. Fulwood had previously requested leave.

81.

After she submitted the request, Ms. Fulwood saw that it had been approved.

82.

Given that employees often encountered problems with the portal, Ms. Fulwood took a picture of the computer screen showing that her leave had been approved.

83.

Ms. Fulwood then advised several coworkers and supervisors that she was feeling and needed to home, and she left work.

84.

Ms. Fulwood was scheduled to work the next day, January 12, 2020, and she reported to work at the appointed time. Ms. Fulwood did not have any indication that the previous day's absence was a problem.

85.

The following day, on Ms. Fulwood's day off, one of Defendant's employees made a modification to Ms. Fulwood's time and attendance record, providing her with one point for an unapproved absence on January 9, 2020.

86.

On January 14, 2020, Ms. Fulwood reported to work for her next scheduled shift, still not having any reason to believe that there was anything amiss.

87.

At some point the same day, a supervisor modified Ms. Fulwood's time and attendance record for January 11, 2020.  Not only was she marked as being absent for that day, the record indicates that she was a "no call/no show."

88.

As a result, Defendant then gave Ms. Fulwood two points for her absence on January 11, 2020.

89.

With the addition of these two additional points, Defendant's records reflected that Ms. Fulwood had purportedly accrued a total of six points during the preceding six-month period.

90.

The same day, ASM Perry called Ms. Fulwood into her office. At some point after Ms. Fulwood arrived, ASM Perry called a human resources representative on her telephone so she could participate remotely in this meeting.

91.

ASM Perry asked Ms. Fulwood if she knew the reason that she had been asked to meet. When Ms. Fulwood responded that she did not, ASM Perry indicated that Ms. Fulwood had been a no call/no show on January 11, 2020.

92.

Ms. Fulwood was shocked to hear this news, and she even pulled out her mobile phone in an attempt to show her manager that her absence on January 11, 2020 had indeed been approved.

93.

ASM Perry continued speaking, apparently ignoring the approval that Ms. Fulwood had shown her, and throughout the conversation she referred to Ms. Fulwood using male pronouns.

94.

Even though the HR representative could hear the entire exchange, she failed and refused to say anything when ASM Perry misgendered Ms. Fulwood.

95.

Given the HR representative's silence, Ms. Fulwood interjected and tried to politely correct ASM Perry.

96.

After she had been corrected by Ms. Fulwood, ASM Perry remarked, "okay, she."

97.

However, almost immediately, ASM Perry once again continued referring to Ms. Fulwood as male and using "he" pronouns.

98.

At this point, the HR representative was clearly aware that Ms. Fulwood was offended by ASM Perry's conduct, but the HR representative refused to say anything.

99.

ASM Perry then told Ms. Fulwood that she was being fired for excessive absences and handed Ms. Fulwood a Georgia Department of Labor Separation Notice. Consistent with its prior position, Defendant even refused to use Ms. Fulwood's preferred name on this pink slip.

100.

After Ms. Fulwood was advised that she was being fired, she made repeated attempts to speak to Store Manager Dennis.  At some point, the Store Manager said that he would have to speak with the store's personnel manager and follow up with Ms. Fulwood, but he never did.

101.

After one month had elapsed from the termination and employees were typically allowed to appeal or reapply, Ms. Fulwood made yet another attempt to reach Store Manager Dennis.

102.

Store Manager Dennis told Ms. Fulwood that she would not be allowed to return to her job.

103.

He also said that she was not able to "prove" that she had been sick on the day of her January 11, 2020 absence.

104.

Even under Defendant's own policies, Ms. Fulwood should not have been terminated.

105.

Ms. Fulwood's time and attendance was not the real reason for her termination, which is a fact that is supported by the Store Manager's comments.

106.

As Store Manager Dennis told her in the final conversation, Ms. Fulwood did "not have the right appearance" and she was "not a good fit for the store."

107.

These comments were not based on Ms. Fulwood's performance of her job.  Rather, they were a clear reference to Ms. Fulwood's gender dysphoria and the fact that she identifies as transgender.

108.

After Ms. Fulwood was fired, Defendant employed another person who identifies as a transgender woman.  This individual was subjected to much of the same treatment as Ms. Fulwood, and after one of Defendant's employees told her that she was "not a real woman," leading to an argument, this individual also found themself terminated.

<u>Procedural/Administrative Background</u>

109.

On or about July 10, 2020, Ms. Fulwood submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she had been subjected to discrimination based on sex and disability in violation of Title VII of the Civil Rights Act and the Americans with Disabilities Act, respectively.  The EEOC assigned Ms. Fulwood Charge Number 410-2020-06822.

110.

Defendant had notice of Ms. Fulwood's Charge of Discrimination, participated in the administrative proceedings before the EEOC, and was represented by counsel during said proceedings.

111.

On September 22, 2021, EEOC ultimately issued its Dismissal and Notice of Rights, which Ms. Fulwood, through counsel, received on the same day.

112.

Ms. Fulwood has exhausted her administrative remedies as to her Charge of Discrimination, and she is filing the instant action within ninety days of her receipt of the EEOC Notice of Right to Sue.

**COUNT I:**
**HOSTILE WORK ENVIRONMENT DUE TO SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

113.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 112, as if the same were set forth herein.

114.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of sex. *See* 42 U.S.C. § 2000e-2(a).

115.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because they are transgender. *Bostock v. Clayton Cnty.*, 590 U.S. ____, 140 S. Ct. 1731 (2020); *see also Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 884 (11th Cir. 2016) (citing *Glenn v. Brumby*, 663 F.3d 1312, 1316-17 (11th Cir. 2011)).

116.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

117.

Plaintiff is a member of a protected class in that she is female and identifies as transgender.

118.

As alleged herein, Defendant refused to allow Plaintiff to use her preferred name, and insisted on referring to her by the name that she was given at birth.

119.

Defendant's insistence on using Plaintiff's legal name was, in itself, offensive to Plaintiff.

120.

Because Defendant insisted on using Plaintiff's legal or birth name, which is one traditionally associated with males, Plaintiff's coworkers became aware that Plaintiff identifies as transgender.  This created an unreasonable and unnecessary risk to Plaintiff's safety and her sense thereof.

121.

Additionally, Defendant's refusal caused Plaintiff's coworkers to make comments, jokes, and otherwise harass Plaintiff concerning her legal name.

122.

Defendant's refusal to use the name that Plaintiff preferred likely caused some of Plaintiff's coworkers to unintentionally offend Plaintiff by using her birthname.

123.

Throughout the duration of Plaintiff's employment, and on a routine and nearly-daily basis, Plaintiff was subjected to comments from her coworkers criticizing her use of the women's restroom.

124.

Additionally, at least supervisor approached Plaintiff directly to question her use of the women's restroom and to criticize the frequency in which Plaintiff had to relieve herself.

125.

Throughout the duration of Plaintiff's employment, and on a routine and nearly-daily basis, Plaintiff was subjected to coworkers who referred to her as male.

126.

Throughout the duration of Plaintiff's employment, and on a routine and nearly-daily basis, Plaintiff was subjected to comments from her supervisors and members of management who referred to her as male.

127.

Despite Plaintiff's repeated requests to be referred to as female, many of said supervisors continued to refer to Plaintiff as male.  As a result, these individuals' conduct was apparently intentional.

128.

Plaintiff's coworkers often mocked Plaintiff for identifying as transgender.

129.

Plaintiff submitted multiple complaints to Defendant's human resources department, but Defendant failed to take the appropriate action to prevent the harassment.

130.

Plaintiff corrected her supervisors who misgendered her and complained about this conduct, but her supervisors failed to take any actions to prevent the harassment.

131.

On several occasions, employees in Defendant 's personnel department observed some of the aforementioned conduct, but refused to take any action whatsoever.

132.

Plaintiff found the aforementioned conduct unwelcome and extremely offensive.

133.

All of the aforementioned conduct was directed to Plaintiff because of her sex, gender identity, and identification as a transgender person.

134.

The aforementioned conduct would not have occurred but for Plaintiff's sex, gender identity, and her identification as a transgender person.

135.

Defendant's employees who identify as a different sex or gender identity than Plaintiff or identify and present as cisgender (i.e., not transgender) were treated better than Plaintiff and not subjected to similar treatment as described herein.

136.

Plaintiff is aware of at least one person employed by Defendant at this location who was subjected to similar treatment as Plaintiff.

137.

Plaintiff was subjected to the aforementioned conduct on a regular and daily basis, beginning at the time that she began her employment until her termination approximately fifteen months later.  Many of Plaintiff's coworkers were responsible for the harassment along with at least three of Plaintiff's supervisors.  As a result, the harassment that Plaintiff experienced was pervasive.

138.

Any reasonable person would have found the aforementioned conduct hostile and abusive.

139.

Any reasonable person who identifies as transgender would have found the aforementioned conduct particularly hostile and abusive.

140.

As a result, the aforementioned conduct that Plaintiff experienced while employed with Defendant, taken either alone or all together, was sufficiently severe and pervasive enough to alter the terms of Plaintiff's employment with Defendant.

141.

Any reasonable person would know that the aforementioned conduct, taken either alone or all together, was completely inappropriate for the workplace.  As a result, the harassment that Plaintiff experienced while working for Defendant was severe.

142.

Any reasonable person, particularly one who identifies as transgender, would know that the aforementioned conduct, taken either alone or all together, was inappropriate for the

workplace. As a result, the harassment that Plaintiff experienced while working for Defendant was severe.

143.

The aforementioned conduct made it difficult for Plaintiff to perform her duties or to even go into work because of the feelings of anxiety, humiliation, and fear for her safety.  As a result, the aforementioned conduct unreasonably interfered with Plaintiff's job performance.

144.

Plaintiff was subjected to the aforementioned conduct from the beginning of her employment, continuing each nearly every day that she worked, and coming from both colleagues and members of management, through the end of her employment over a year later.  As a result, Plaintiff's workplace was permeated with this discriminatory intimidation, ridicule, and insult.

145.

Plaintiff's supervisors were aware of the harassment, of which both Plaintiff's coworker's and supervisors were responsible, but the supervisors failed to address or correct the conduct, or provide Plaintiff with any opportunity to engage in any preventative or corrective measures.

146.

Moreover, Plaintiff's supervisors were responsible for some of the aforementioned conduct.

147.

Accordingly, Defendant subjected Plaintiff to harassment and hostile work environment in violation of Title VII of the Civil Rights Act.

148.

Accordingly, Defendant is liable for both the conduct of its non-supervisory employees and its supervisors.

149.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned offensive conduct.

150.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**HOSTILE WORK ENVIRONMENT DUE TO DISABILITY**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

151.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 112, as if the same were set forth herein.

152.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

153.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under the Americans with Disabilities Act, respectively. *See* 42 U.S.C. § 12111.

154.

As alleged herein, Plaintiff suffers from gender dysphoria, which substantially limits a number of Plaintiff's major life activities.

155.

At all relevant times, Plaintiff was qualified to perform the essential functions of her job and was able to perform said functions with or without a reasonable accommodation.

As alleged herein, Defendant refused to allow Plaintiff to use her preferred name, and insisted on referring to her by the name that she was given at birth.

156.

Defendant's insistence on using Plaintiff's legal name was, in itself, offensive to Plaintiff.

157.

Because Defendant insisted on using Plaintiff's legal or birth name, which is one traditionally associated with males, Plaintiff's coworkers became aware that Plaintiff identifies as transgender. This created an unreasonable and unnecessary risk to Plaintiff's safety and her sense thereof.

158.

Additionally, Defendant's refusal caused Plaintiff's coworkers to make comments, jokes, and otherwise harass Plaintiff concerning her legal name.

159.

Defendant's refusal to use the name that Plaintiff preferred likely caused some of Plaintiff's coworkers to unintentionally offend Plaintiff by using her birthname.

160.

Throughout the duration of Plaintiff's employment, and on a routine and nearly-daily basis, Plaintiff was subjected to comments from her coworkers criticizing her use of the women's restroom.

161.

Additionally, at least supervisor approached Plaintiff directly to question her use of the women's restroom and to criticize the frequency in which Plaintiff had to relieve herself.

162.

Throughout the duration of Plaintiff's employment, and on a routine and nearly-daily basis, Plaintiff was subjected to coworkers who referred to her as male.

163.

Throughout the duration of Plaintiff's employment, and on a routine and nearly-daily basis, Plaintiff was subjected to comments from her supervisors and members of management who referred to her as male.

164.

Despite Plaintiff's repeated requests to be referred to as female, many of said supervisors continued to refer to Plaintiff as male.  As a result, these individuals' conduct was apparently intentional.

165.

Plaintiff's coworkers often mocked Plaintiff for having gender dysphoria.

166.

Plaintiff submitted multiple complaints to Defendant's human resources department, but Defendant failed to take the appropriate action to prevent the harassment.

167.

Plaintiff corrected her supervisors who misgendered her and complained about this conduct, but her supervisors failed to take any actions to prevent the harassment.

168.

On several occasions, employees in Defendant 's personnel department observed some of the aforementioned conduct, but refused to take any action whatsoever.

169.

Plaintiff found the aforementioned conduct unwelcome and extremely offensive.

170.

All of the aforementioned conduct was directed to Plaintiff because of her aforementioned disability.

171.

The aforementioned conduct would not have occurred but for Plaintiff's disability.

172.

Defendant's employees who do not have gender dysphoria were treated better than Plaintiff and not subjected to similar treatment as described herein.

173.

Plaintiff was subjected to the aforementioned conduct on a regular and daily basis, beginning at the time that she began her employment until her termination approximately fifteen months later.  Many of Plaintiff's coworkers were responsible for the harassment along with at

least three of Plaintiff's supervisors.  As a result, the harassment that Plaintiff experienced was pervasive.

174.

Any reasonable person would have found the aforementioned conduct hostile and abusive.

175.

Any reasonable person who has gender dysphoria would have found the aforementioned conduct particularly hostile and abusive.

176.

As a result, the aforementioned conduct that Plaintiff experienced while employed with Defendant, taken either alone or all together, was sufficiently severe and pervasive enough to alter the terms of Plaintiff's employment with Defendant.

177.

Any reasonable person would know that the aforementioned conduct, taken either alone or all together, was completely inappropriate for the workplace.  As a result, the harassment that Plaintiff experienced while working for Defendant was severe.

178.

Any reasonable person, particularly one who has gender dysphoria, would know that the aforementioned conduct, taken either alone or all together, was inappropriate for the workplace. As a result, the harassment that Plaintiff experienced while working for Defendant was severe.

179.

The aforementioned conduct made it difficult for Plaintiff to perform her duties or to even go into work because of the feelings of anxiety, humiliation, and fear for her safety.  As a result, the aforementioned conduct unreasonably interfered with Plaintiff's job performance.

180.

Plaintiff was subjected to the aforementioned conduct from the beginning of her employment, continuing each nearly every day that she worked, and coming from both colleagues and members of management, through the end of her employment over a year later.  As a result, Plaintiff's workplace was permeated with this discriminatory intimidation, ridicule, and insult.

181.

Plaintiff's supervisors were aware of the harassment, of which both Plaintiff's coworker's and supervisors were responsible, but the supervisors failed to address or correct the conduct, or provide Plaintiff with any opportunity to engage in any preventative or corrective measures.

182.

Moreover, Plaintiff's supervisors were responsible for some of the aforementioned conduct.

183.

Accordingly, Defendant subjected Plaintiff to harassment and hostile work environment in violation of the Americans with Disabilities Act.

184.

Accordingly, Defendant is liable for both the conduct of its non-supervisory employees and its supervisors.

185.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned offensive conduct.

186.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT III:
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

187.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 112, as if the same were set forth herein.

188.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

189.

Discrimination based on disability includes an employer's failure to make a "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

190.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

191.

As alleged herein, Plaintiff suffers from gender dysphoria, which substantially limits a number of Plaintiff's major life activities.

192.

At all relevant times, Plaintiff was qualified to perform the essential functions of her job and was able to perform said functions with or without a reasonable accommodation.

193.

As alleged herein, Defendant was aware of Plaintiff's disability.

194.

As alleged herein, Defendant was also aware of Plaintiff's need for a reasonable accommodation for her disability.

195.

Notwithstanding the fact that Defendant knew of Plaintiff's need for a reasonable accommodation, Plaintiff specifically requested that Defendant allow her to use her preferred name, her preferred pronouns, and to use the restroom for the gender in which she identified.  These requests were consistent with Plaintiff's treatment for her gender dysphoria.

196.

The accommodations requested by Plaintiff were available, would have been effective, and would not have posed an undue hardship on Defendant.

197.

Defendant failed and refused to provide Plaintiff with the accommodations that she requested.

198.

Defendant also failed to engage in the interactive process to explore other accommodations that may have been available.

199.

Defendant not only refused to accommodate Plaintiff's disability, it was aware of, but refused to address conduct in the workplace that was detrimental to Plaintiff and inconsistent with her treatment for her gender dysphoria.

200.

Plaintiff has been injured by Defendant's discrimination based on disability due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT IV:
## DISCRIMINATION BASED ON SEX
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

201.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 112, as if the same were set forth herein.

202.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

203.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because they are transgender.  *Bostock v. Clayton Cnty.*, 590 U.S. ____, 140 S. Ct. 1731 (2020); *see also Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 884 (11th Cir. 2016) (citing *Glenn v. Brumby*, 663 F.3d 1312, 1316-17 (11th Cir. 2011)).

204.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

205.

Plaintiff is a member of a protected class in that she is female and identifies as transgender.

206.

As alleged herein, Plaintiff was qualified for, and was satisfactorily performing in the position for which she was employed.

207.

Defendant treated Plaintiff's colleagues, who had less tenure and were less qualified than Plaintiff, more favorably that Plaintiff in that they received raises, got promoted to full-time status, and received promotions before Plaintiff.

208.

Even when Defendant did convert Plaintiff to full-time status, Plaintiff did not receive the same benefits as her counterparts.

209.

Defendant also treated Plaintiff less favorably than her coworkers when it terminated Plaintiff's employment after she had purportedly accrued six points for absence.

210.

Unlike Plaintiff's coworkers, Defendant refused to consider removing some of the points that she purportedly accrued.

211.

Unlike Plaintiff's coworkers, Defendant refused to allow Plaintiff to appeal her termination or apply for re-employment after a period of thirty days.

212.

All of the aforementioned conduct was directed to Plaintiff because of her sex, gender identity, and identification as a transgender person.

213.

The aforementioned conduct would not have occurred but for Plaintiff's sex, gender identity, and her identification as a transgender person.

214.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for subjecting Plaintiff to the aforementioned conduct or treating Plaintiff less favorably than her coworkers who did not identify as transgender.

215.

Plaintiff has been injured by Defendant's discrimination, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT V:**
**DISCRIMINATION BASED ON DISABILITY**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

216.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 112, as if the same were set forth herein.

217.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

218.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under the Americans with Disabilities Act, respectively. *See* 42 U.S.C. § 12111.

219.

As alleged herein, Plaintiff suffers from gender dysphoria, which substantially limits a number of Plaintiff's major life activities.

220.

At all relevant times, Plaintiff was qualified to perform the essential functions of her job and was able to perform said functions with or without a reasonable accommodation.

221.

Defendant treated Plaintiff's colleagues, who had less tenure and were less qualified than Plaintiff, more favorably that Plaintiff in that they received raises, got promoted to full-time status, and received promotions before Plaintiff.

222.

Even when Defendant did convert Plaintiff to full-time status, Plaintiff did not receive the same benefits as her counterparts.

223.

Defendant also treated Plaintiff less favorably than her coworkers when it terminated Plaintiff's employment after she had purportedly accrued six points for absence.

224.

Unlike Plaintiff's coworkers, Defendant refused to consider removing some of the points that she purportedly accrued.

225.

Unlike Plaintiff's coworkers, Defendant refused to allow Plaintiff to appeal her termination or apply for re-employment after a period of thirty days.

226.

All of the aforementioned conduct was directed to Plaintiff because of her disability.

227.

The aforementioned conduct would not have occurred but for Plaintiff's disability.

228.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for subjecting Plaintiff to the aforementioned conduct or treating Plaintiff less favorably than her coworkers who did not have gender dysphoria.

229.

Plaintiff has been injured by Defendant's discrimination, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vivian Fulwood respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendants Walmart Inc. and Wal-Mart Stores East, LP, and that said Defendants be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count I for subjecting Plaintiff to harassment and a hostile work environment based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count II for subjecting Plaintiff to harassment and a hostile work environment based on disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count III for failure to provide a reasonable accommodation, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

6)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count IV for discrimination based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

7)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count V for discrimination based on disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act; and,

8)      For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 21st day of December, 2021.


KENNETH E. BARTON III
Georgia Bar No. 301171
EMILY M. WALKER
Georgia Bar No. 221826
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
emw@cooperbarton.com